**Gilfredo S. LOPEZ, Appellant,**

v.

**UNITED STATES, Appellee.**

**Nos. 01–CO–107, 98–CF–1619.**

District of Columbia Court of Appeals.

Argued Feb. 21, 2002.

Decided June 6, 2002.

Paul Y. Kiyonaga, for appellant.

Joseph W. Clark, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney, and John R. Fisher, Thomas J. Tourish, Anthony Asuncion, Carolyn K. Kolben, and John P. Gidez, Assistant United States Attorneys, were on the brief, for appellee.

Before WAGNER, Chief Judge, and REID and GLICKMAN, Associate Judges.

REID, Associate Judge:

Appellant Gilfredo S. Lopez challenges his convictions of the lesser included offense of murder in the second-degree while armed, in violation of D.C.Code §§ 22–2403, –3202 (1996);[1] assault with intent to kill while armed, in violation of §§ 22–501, –3202;[2] possession of a firearm during a crime of violence, in violation of § 22–3204(b);[3] and carrying a pistol without a license, in violation of § 22–3204(a).[4] He contends that the trial court committed reversible errors with respect to his assertion of a self-defense theory; and that he was substantially prejudiced by the prosecutor's alleged improper cross-examination and argument. Mr. Lopez also appeals from the denial without a hearing of his post-conviction motion alleging ineffective assistance of counsel. He maintains that his defense was prejudiced by his trial

---

**1.** Recodified as D.C.Code §§ 22–2103, –4502 (2001).

**2.** Recodified as D.C.Code §§ 22–401, –4502 (2001).

**3.** Recodified as D.C.Code § 22–4504(b) (2001).

**4.** Recodified as D.C.Code § 22–4504(a) (2001).

counsel's deficient trial preparation and failure to present key witnesses who would have supported his claim of self-defense. We conclude that (1) Mr. Lopez presented affidavits alleging facts warranting relief, and thus, he was entitled to a hearing on his § 23–110 motion; but that (2) the trial court did not commit reversible error either with respect to the opening statement of defense counsel or the giving of jury instructions pertaining to self-defense.

## FACTUAL SUMMARY

The record on appeal shows that in the early morning hours of December 23, 1995, while he was working as a security guard outside a nightclub located in the Southeast quadrant of the District of Columbia, Luis Galeano watched as seven men were thrown out of the night club, including Mr. Lopez and his co-defendant Raul Lopez–Gonzalez;[5] and Carlos and Ruben Flores (the decedent), who are cousins.[6] Mr. Lopez and Mr. Lopez–Gonzalez left the nightclub in a white Honda Civic automobile driven by Mr. Lopez, and Ruben and Carlos Flores departed in a green Toyota Forerunner truck driven by Carlos Flores. Carlos Flores testified that when they saw the white Honda, Ruben Flores pointed to the occupants as the "ones who just punched [him]." The Flores cousins proceeded to follow the white Honda. Mr. Galeano stated on cross-examination that: "[I]t's fair to say that [the Toyota truck] was chasing [Mr. Lopez's vehicle]."

Carlos Flores recalled that when they were chasing the white Honda, Ruben Flores threw a bottle out of the window of the Toyota truck at the Honda. Mr. Lopez testified that he fired a warning shot out of the window of the Honda. Mr. Galeano saw the driver of the white Honda stop and get out of the car, with a gun in his hand, and watched as the driver of the green Toyota, Mr. Carlos Flores, who had parked directly behind the Honda, exited the truck.[7] To Mr. Galeano, "it just looked like it was going to be a fistfight." Mr. Lopez "raise[d] his hand towards the front of the car, ... [and] one shot was fired...." Carlos Flores testified that Ruben Flores "kept yelling at [him], get back in the [truck], get back in the [truck], and I got back in the [truck], and that is when the gunshots started." According to Carlos Flores, Ruben Flores never left the truck. Mr. Galeano called for assistance. He heard approximately three to four shots, at least one of which fatally wounded Mr. Ruben Flores.[8]

Mr. Lopez testified on his own behalf, claiming self-defense.[9] He stated that the two men in the Toyota truck began to pursue his Honda and the passenger, Ruben Flores, threw beer bottles at his car. Even after Mr. Lopez "fired a warning shot," the Toyota truck continued to follow his Honda. Mr. Lopez thought the men in the Toyota truck were armed and he feared for his life. Eventually, Mr. Lopez had to stop his vehicle because cars in front of him were not moving. He opened

5. Mr. Lopez–Gonzalez' last name also appears in the record as "Gonzales."

6. These men and others had been involved in a fight inside the club. The fight apparently related to issues between two gangs, Vatos Locos and El Palo.

7. According to Mr. Galeano's testimony, Carlos Flores did not have a gun.

8. Mr. Galeano did not see any weapon in the possession of Mr. Ruben Flores.

9. Mr. Lopez admitted shooting Ruben Flores. Kenneth D. Arrington, a Metropolitan Police Department officer with the Homicide Unit, testified that Mr. Lopez asserted "words to the effect that I tell my people in my gang that if you do a crime, you be a man ... and that I shot him."

the driver's side of the Honda and got out. He testified that he had "no intentions of hitting anyone that night." However, he "didn't know if [Carlos and Ruben Flores] had a weapon or not ... [or] whether [Ruben Flores] was looking for a weapon.... So [he] fired in the passenger side and when [he saw] Ruben Flores open his door." Later in his testimony he declared: "I was shooting at the truck and I shot at the passenger side when [Ruben Flores] opened his door."

## ANALYSIS

### The Collateral Attack

We turn our attention first to Mr. Lopez's collateral attack, based on allegations of ineffective assistance of counsel. He contends that the trial court erred by not holding a hearing on his D.C.Code § 23–110 motion. He also claims that his trial counsel failed to: (1) call two critical lay witnesses, Miguel Sandoval and Nelson Reyes, and one expert witness, Hal Sharpe; (2) prepare him adequately for his testimony; and (3) develop a coherent strategy concerning gang affiliation.

### Applicable Legal Principles

■ We continue to adhere to the presumption that when a § 23–110 motion is filed, the trial court should conduct a hearing on the motion. *See Lanton v. United States*, 779 A.2d 895, 901 (D.C. 2001). "In order to uphold the denial of a § 23–110 motion without a hearing, we must be satisfied that 'under no circumstances could the petitioner establish facts warranting relief.'" *Id.* (quoting *Ramsey v. United States*, 569 A.2d 142, 147 (D.C. 1990)) (quoting *Fontaine v. United States*, 411 U.S. 213, 215, 93 S.Ct. 1461, 36 L.Ed.2d 169 (1973)). We have stated consistently, however, "that no hearing is required where defendant's motion 'consists of (1) vague and conclusory allegations, (2) palpably incredible claims, or (3) allega-

tions that would merit no relief even if true.'" *Courtney v. United States*, 708 A.2d 1008, 1011 (D.C.1998) (quoting *Ready v. United States*, 620 A.2d 233, 234 (D.C. 1993) (citation omitted)), *cert. denied*, 525 U.S. 1087, 119 S.Ct. 837, 142 L.Ed.2d 692 (1999). Whether to hold a hearing is a matter committed to the sound discretion of the trial court. *See Little v. United States*, 748 A.2d 920, 922 (D.C.2000) (citation omitted).

Furthermore, to establish ineffective assistance of counsel, Mr. Lopez "must show (1) deficient performance by his trial counsel, and (2) prejudice traceable to his trial counsel's deficiencies. The burden is a heavy one because of a strong presumption that defense counsel has rendered reasonable professional assistance." *Zanders v. United States*, 678 A.2d 556, 569 (D.C. 1996) (quoting *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)).

### The Post–Trial Affidavits and the § 23–110 Hearing Issue

■ Where an allegation is made that trial counsel was deficient because he or she "fail[ed] to call prospective witnesses, we have required 'an affidavit or other credible proffer as to the allegedly exculpatory nature of [the prospective witnesses'] testimony," *Lanton, supra*, 779 A.2d at 902 (quoting *Ready, supra*, 620 A.2d at 235) (second alteration in original). Such affidavits may demonstrate the need for a hearing on an appellant's § 23–110 claims of ineffective assistance of counsel. Here, affidavits from Mr. Sandoval, Mr. Reyes, Mr. Sharpe, and Mr. Lopez were attached to the § 23–110 motion. In addition, trial counsel filed an affidavit in support of the government's opposition to Mr. Lopez's motion.

The trial court in essence discounted the affidavits presented in support of Mr. Lo-

pez's motion, declaring that: "Because the motion and files and records of the case conclusively show that Defendant is entitled to no relief, no hearing will be ordered." Furthermore, the court stated that: "Assuming for the sake of argument the truthfulness of each of the affidavits submitted by Defendant, Defendant has not met his burden of showing either deficient performance by counsel or prejudice." In disposing of the motion, the trial judge relied upon defense counsel's affidavit to explain his tactical reasons for not calling Mr. Reyes, Mr. Sandoval and Mr. Sharpe as witnesses. Yet, even though there were conflicts between defense counsel's affidavit and those from Mr. Reyes, Mr. Sandoval and Mr. Sharpe, the trial judge asserted that Mr. Lopez's "entitlement to relief does not depend on the Court making any credibility determinations between affiants." An examination of the affidavits suggests otherwise; in fact, the trial court credited the affidavit of trial counsel, but not those lodged by Mr. Lopez. Furthermore, the affidavits reveal matters that cannot be resolved by reference to the existing record in this case.

Defense counsel's affidavit states that he did not call Mr. Reyes as a witness be- cause, according to notes from an investigator hired by one of Mr. Lopez's prior attorneys: Mr. Reyes indicated that, while he saw both the passenger and driver side doors open, "[h]e did not see anyone get out." However, the investigator's notes are not attached to defense counsel's affidavit, and defense counsel did not personally interview Mr. Reyes. Furthermore, defense counsel did not mention in his affidavit that Mr. Reyes indeed had been duly scheduled to testify and was under a defense subpoena; that the testimony of Mr. Reyes was "critical"[10] and that both counsel and Mr. Lopez had telephoned Mr. Reyes's home the previous evening to remind him to be in court on the following day; and that efforts would continue to get Mr. Reyes to report to court voluntarily. The trial court then indicated that it would "authorize a bench warrant, a forthwith bench warrant for [Mr. Reyes]." After defense counsel conferred with Mr. Lopez, however, he advised the court that Mr. Lopez "[did] not want to upset his good friend." Therefore, he no longer wanted the trial court to issue a bench warrant for him, but that defense counsel and Mr. Lopez "[would] make telephone calls and try to get him in."[11] Moreover, Mr.

10. In explaining the "critical" nature of Mr. Reyes' testimony, defense counsel informed the court that:

> My client will testify that my client saw the passenger door open. Mr. [Reyes] was in a car right behind the [green Toyota truck] and ... will also testify and therefore he will corroborate what my client is saying.

11. In her memorandum and order, the trial judge emphasized that "[defense] counsel ... withdrew the request for a bench warrant at Defendant's insistence ... [despite the Court's warning] at the time that if he declined the Court's offer to have [Mr.] Reyes brought to court by arrest on a bench warrant, the trial would not be delayed to await the witness' voluntary appearance." We addressed a sim- ilar rationale in *Frederick v. United States*, 741 A.2d 427 (D.C.1999):

> [The appellant's] attorney testified, and the judge found, that the decision by the defense to proceed to trial without [the prospective witness] was made by [the appellant] personally. Assuming, without deciding, that such a determination—one that obviously requires a professional evaluation of the strength of the evidence—may properly be left by counsel to a lay client who has had no legal training, we are satisfied that, on this record, the fact that [the appellant] apparently decided to go ahead without his star witness is irrelevant to the proper disposition of the question before us, namely, whether trial counsel's representation of [the appellant] was constitutionally ineffective.

Reyes' affidavit contradicted that of defense counsel.

Mr. Reyes' affidavit indicates that on the night of the shooting, Mr. Reyes was in a car with his cousin, Mr. Sandoval; their car was behind the Honda and the Toyota truck. Mr. Reyes saw the passenger in the Toyota truck throw beer bottles at the Honda. When the cars stopped, Mr. Reyes "observed [Mr.] Lopez exit the Honda, at the same time that both the driver and passenger [that is, the decedent, Mr. Ruben Flores] in the Toyota were exiting that car." He "recall[ed] specifically that the passenger in the Toyota had opened his door and was getting out of the car." He added: "It appeared that the occupants of the Toyota were getting out to fight with the occupants of the Honda, in that both occupants opened their doors quickly and forcefully immediately after the Toyota had come to a stop." Mr. Reyes further stated that he had met with one of Mr. Lopez's prior attorneys, given her the information that is set forth in his affidavit; and that he appeared in court in response to a subpoena, but that the case had been continued. Later, he received a message from Mr. Lopez's new counsel that he would be contacted about appearing as a witness on behalf of Mr. Lopez, and he was willing to appear. Nonetheless, the attorney made no further contact with him.

Defense counsel explained in his affidavit that he did not call Mr. Sandoval as a witness because he had a criminal record

and would testify, contrary to Mr. Reyes' statement, that the door of the Toyota truck did not open.[12] Counsel also stated that he had "become very cautious about using friends and family as witnesses" because they could "damage" the case.

In contrast with defense counsel's affidavit, Mr. Sandoval's affidavit asserts that he was prepared to testify, in part, that Mr. Reyes and he were in a car when they saw the Honda and Toyota truck, and that:

> We followed both cars. Both cars then came to a stop a short distance later, and the car I was in stopped right behind the SUV. I then witnessed the passenger of the SUV open his door and get out very quickly, as if he were about to get into a fight. I recognized him as the man who had assaulted me earlier at the club. At that moment I heard what sounded like gunshots, and then saw the passenger of the SUV get back in the car. From my vantage point, I could not see if the driver of the SUV had gotten out of the car.

Mr. Sandoval also said that he had met "with a man and a woman, one of whom I understood to be Mr. Lopez's attorney, . . . and communicated to them the facts as recounted in [his] affidavit." He also declared that he had appeared in court in response to a subpoena, only to find that the case had been continued. He received a letter advising him of the new trial date, but subsequently, an attorney called to alert him that that date was no longer good, and that he would let him know

*Id.* at 438.

12. In drawing these conclusions, defense counsel's affidavit establishes that he relied on the files of Mr. Lopez's prior counsel, Heather Shaner, particularly information provided by her investigator, Arnold Giesemann:

> As is evident from Mr. Giesemann's report, [Mr. Sandoval] has a criminal record and in fact had gotten into a fight at Tracks [the

nightclub] two or three weeks earlier; second, he would testify that the passenger side door of the [Toyota truck] did not open. This was different from what Mr. Reyes would testify to: that the door did open.

The record on appeal contains no evidence that defense counsel himself interviewed Mr. Sandoval or Mr. Reyes.

when to appear. He heard nothing more from the attorney.

Trial counsel's affidavit states that he did not call Mr. Sharpe, "a specialist in the scientific investigation of alleged homicides," as a witness because his proposed testimony that "the passenger had gotten out of the car" would conflict with that of Mr. Reyes and Mr. Sandoval. Mr. Sharpe's affidavit, which is consistent with those of Mr. Reyes and Mr. Sandoval as well as the trial testimony of Mr. Lopez, summarizes the testimony that he would have given as a witness:

> I ... would have testified, to a reasonable degree of scientific certainty, that the decedent/passenger of the Toyota Forerunner was *not* seated in that vehicle at the time he was shot. I reached this conclusion based on, *inter alia,* the fact that glass fragments from the passenger side window were scattered on top of the passenger side seat. I interpret this fact to mean that no one was in the seat at the time the passenger side window was shattered. The glass in that passenger side window was tempered; tempered glass breaks into many small pieces when shattered. Moreover, I found no glass fragments on the decedent's sweater, after examining the sweater thoroughly under a microscope. If the decedent had been seated in the vehicle at the time the passenger side window was broken, glass fragments would have been [p]resent on the sweater.

Although Mr. Sharpe "provided a summary of [his] investigation to [Mr. Lopez's prior counsel]," he never heard from the attorney who actually handled his trial.

In his handwritten affidavit, Mr. Lopez maintained that on the first day of his trial, he expressed concern to his trial counsel about the appearance of Mr. Reyes and Mr. Sandoval as witnesses in his case. Trial counsel "assured" him that they would be contacted over the weekend. Mr. Lopez tried to contact both men himself, but his "telephone access [was] very limited in jail." One month before trial, Mr. Lopez asked defense counsel whether he had an investigator and informed him that he "wanted him to arrange to get statement[s] from [Mr.] Sandoval and [Mr.] Reyes." Mr. Lopez also inquired as to whether trial counsel would call Mr. Sharpe. Counsel replied in the negative, without explanation.

Our review of the affidavits submitted shows a clear conflict between defense counsel's affidavit [13] and those presented in support of Mr. Lopez's motion. Moreover, the affidavits of Mr. Reyes and Mr. Sandoval tend to support Mr. Lopez's claim of self-defense because their testimony would confirm that bottles were thrown at the Honda by the passenger in the Toyota truck, Ruben Flores; and would negate Carlos Flores' testimony that the passenger in the Toyota truck did not move from his seat in the vehicle.[14] Furthermore, Mr. Sharpe's expert testimony would have established that Ruben Flores could not

13. Although defense counsel's affidavit relies in part on file notes from the investigator hired by Mr. Lopez's prior counsel, those notes are neither attached to his affidavit nor offered for *in camera* review by the trial judge.

14. In his affidavit, Mr. Reyes states that he "observed [Mr.] Lopez exit the Honda, at the same time that both the driver and passenger in the Toyota were exiting that car." Mr. Sandoval's affidavit states that he "witnessed the passenger of the [Toyota] open his door and get out very quickly, as if he were about to get into a fight[,]" but that: "From [his] vantage point, [he] could not see if the driver of the [Toyota] had gotten out of the car."

have been seated in the Toyota truck when he was fatally wounded.

There is a reasonable probability that the testimony of Mr. Reyes, Mr. Sandoval and Mr. Sharpe, if consistent with their affidavits and believed by reasonable jurors, would have affected the outcome of the case because of its tendency to support Mr. Lopez's self-defense theory.[15] Although he was charged with first-degree murder while armed, Mr. Lopez was convicted only of second-degree murder while armed, and the testimony of the three additional witnesses might well have altered a reasonable juror's view of the evidence relating to mitigating circumstances or the defense of self-defense. Thus, we are unable to say, as our case law requires before concluding that an appellant was not entitled to a hearing on his § 23–110 motion, that "we [are] satisfied that 'under no circumstances could [Mr. Lopez] establish facts warranting relief'" under D.C.Code § 23–110. *Lanton, supra,* 779 A.2d at 901(referencing *Ramsey v. United States,* 569 A.2d 142, 147 (D.C.1990) (quoting *Fontaine v. United States,* 411 U.S. 213, 215, 93 S.Ct. 1461, 36 L.Ed.2d 169 (1973)). On the contrary, there are facts asserted which would warrant relief under § 23–110. Nor can we say on the record before us that the allegations in Mr. Lopez's § 23–110 motion are "vague and con-clusory" or "palpably incredible." *Court-ney, supra,* 708 A.2d at 1011.

We have recognized previously that the failure of trial counsel to investigate properly a case, "'to interview exculpatory witnesses, and to present their testimony constitutes constitutional ineffectiveness.'" *Lanton, supra,* 779 A.2d at 901 (quoting *Byrd v. United States,* 614 A.2d 25, 30 (D.C.1992)); *see also Frederick, supra,* 741 A.2d at 439. Had a hearing on Mr. Lopez's § 23–110 motion been held, "[t]he trial judge would then have had a far more complete and reliable record on which to base her disposition of [Mr. Lopez's] claims of deficient performance and prejudice." *Lanton, supra,* 779 A.2d at 904. In short, in light of our case law, the trial court abused its discretion in denying Mr. Lopez's request for a hearing on his § 23–110 motion.

*The Direct Appeal*

◼ We turn now to Mr. Lopez's direct appeal in order to determine whether we should reverse his conviction and remand for a new trial, or whether we should only remand the case for a hearing on his § 23–110 motion to determine whether ineffective assistance of counsel was rendered, thus warranting a new trial. We discuss in detail only two of his arguments.[16] He

---

15. Mr. Lopez is not required to show that he would have been acquitted had Mr. Reyes, Sandoval and Sharpe testified. As we made clear in *Frederick, supra:*

> In order to satisfy *Strickland's* prejudice prong, [the appellant] was required to demonstrate a reasonable probability that, but for his attorney's errors, the result of the trial would have been different. [The appellant] need not show, however, that if [the prospective witness] had testified, [the appellant] would necessarily have been acquitted. "'The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponder-

ance of the evidence to have determined the outcome.'" *Id.* at 439 (quoting *Strickland, supra,* 466 U.S. at 694, 104 S.Ct. 2052).

16. We are unpersuaded by his arguments that the prosecutor "improperly questioned him at length about why he had not told the police after his arrest that he had killed the decedent in self-defense"; and that "[t]he prosecutor compounded [the matter] during his rebuttal in closing argument[.]" Mr. Lopez maintains that: "Th[e] line of questioning and th[e] argument in a closing rebuttal were an improper and highly prejudicial commentary on Appellant's post-arrest, pretrial silence." We detect no plain error with respect to the cross-examination. *See Anderson v. Charles,*

contends that the trial court committed reversible error by refusing to permit the introduction of his self-defense theory in his opening statement, and by giving a variation of the standard self-defense jury instruction.

■ During the discussion of preliminary matters prior to the commencement of the trial, counsel for Mr. Lopez inquired: "[W]ould the Court consider reading any of the self-defense instructions prior to the beginning of the trial?" The trial judge responded: "No, because whether that instruction is appropriate depends on the evidence." When defense counsel emphasized that the theory of his case was self-defense, the judge retorted: "Opening statement is what the evidence will show." After defense counsel made a proffer as to what the evidence would show, based on Mr. Lopez's anticipated testimony, the judge wanted to know the nature of the "continuing assault," specifically, what Carlos and Ruben Flores were doing when Mr. Lopez got out of his white Honda. Following additional discussion the judge decided to make no commitment as to whether the self-defense instruction would be given. However, defense counsel was allowed to "refer to [his] defense theory in terms of [Mr. Lopez's] mind set but without legitimate argument as a legal theory." In other words, said the judge: "You can say what your client believed,

but not argue the law." In his opening statement, defense counsel described the chase by Ruben and Carlos Flores, the bottle thrown out of the Toyota truck, the warning shot fired by Mr. Lopez, and summarized the defense position as follows:

[I]t's our position that my client was in imminent fear of his life and he thought what was reasonable to do was to use the gun. You will hear, he is going to admit he was wrong for having that gun. He will pay his debt to society because he illegally had a gun. But he felt he had the right to fire back because he felt he could have gotten hurt.

■ "[T]he scope and extent of defendant's opening statement rests largely within the discretion of the trial judge." *Jennings v. United States*, 431 A.2d 552, 560 (D.C.1981) (citations omitted), *cert. denied*, 457 U.S. 1135, 102 S.Ct. 2964, 73 L.Ed.2d 1353 (1982); *see also Wright v. United States*, 508 A.2d 915, 919 (D.C. 1986). The trial court did not abuse its discretion by stressing that the opening statement is designed to set forth the evidence to be presented, and by permitting defense counsel to refer to the defense theory but not to argue the law. *See Oesby v. United States*, 398 A.2d 1, 5 (D.C. 1979). Reasonable jurors could conclude from defense counsel's opening statement that Mr. Lopez thought he was in imminent danger and used his gun in a reason-

447 U.S. 404, 408, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980) (per curiam); *Hill v. United States*, 404 A.2d 525, 531 (D.C.1979). Nor do we see plain error relating to the prosecutor's rebuttal argument. *See Byers v. United States*, 649 A.2d 279, 288–89 (D.C.1994); *Mills v. United States*, 599 A.2d 775, 787 (D.C.1991). Mr. Lopez was not questioned about any post-arrest or pre-trial silence, as he alleges, but about omissions from his voluntary statement to the police that would have supported a claim of self-defense. Under the circumstances, permitting cross-examination for impeachment purposes did not amount to plain

error. As we said in *Hill v. United States*, 404 A.2d 525 (D.C.1979):

When the defendant begins voluntarily to explain his conduct it becomes clear he is not relying on his rights under *Miranda* [*v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)]. He may reassert the right at any point but if what he has voluntarily said is arguably inconsistent with his in-court testimony surely he is not immune from impeachment with his inconsistent or contradictory statement.

*Id.* at 531, 86 S.Ct. 1602.

able manner, thereby acting in self-defense. Contrary to Mr. Lopez's position, we detect no prejudice flowing from the trial court's legitimate exercise of discretion with respect to his counsel's opening statement.

■ Mr. Lopez further argues that the trial court's conditional language in its self-defense instruction not only differed from the Red Book instruction, but also "quite effectively telegraphed to the jury that there *might not* be evidence of self-defense present in the case .... [,] misstated the appropriate burdens of proof and weakened the heart of the defense case." At trial he raised no objection to the instruction as given.

■ We review the jury instructional issue for plain error, being mindful that: " 'It is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court.' " *Wishop v. United States,* 531 A.2d 1005, 1008 (D.C.1987) (quoting *Henderson v. Kibbe,* 431 U.S. 145, 154, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977) (footnote omitted)). In examining the alleged error, we review the instructions in their entirety. *See Hunt v. United States,* 729 A.2d 322, 325 (D.C.1999) (citation omitted).

Prior to deciding on what instructions to give regarding self-defense, the trial judge and counsel for Mr. Lopez and for the government spent considerable time in argument and discussion, and in reviewing pertinent case law. The trial judge proposed a modification of the self-defense instruction, saying that she was "not wedded to the exact wording" and suggesting that counsel could "help ... refine it...." She then stated: "I would add[,] if you find that a version of the evidence amounts to self-defense, as it will be defined, then the Government must prove beyond a reasonable doubt that the defendant did not act in self-defense. If it does not, you must find the defendant not guilty on both murder and manslaughter." When the trial judge completed her explanation of what she intended to do, defense counsel stated: "[T]he only concern that I have is that I believe that the Government must still prove beyond a reasonable doubt that my client did not act in self-defense."

After further discussion, defense counsel asked for the court's "rationale" for changing the language of the Red Book instruction. She replied: "The language in the Red Book seems to be declaring that this case does have evidence of self-defense. What I want to make clear is if the jury finds that there is such evidence, rather than—if there is such evidence." Defense counsel remarked: "I don't have any objection. No objection. I hate to stray from the Red Book. But, for the record, I don't think that that hurts my client. It does not hurt my closing argument, I don't think."

The trial judge continued to explain the difficulty of her decision to alter the Red Book instruction, and the reasons for it. In response, defense counsel again stated: "Your Honor, I don't see that the Court's modifications significantly or materially changes my client's rights or my arguments."

When the trial court instructed the jury on self-defense, it began by defining "mitigating circumstances" and the terms "heat of passion" and "adequate provocation." She explained that: "Mitigating circumstances also exist where a person honestly but unreasonably believes that he is acting in self-defense." She added that while "[m]itigating circumstances are not a defense to manslaughter[,][s]elf-defense is a complete defense to murder and to manslaughter." Then the trial judge stated:

If a version of the facts in a case amounts to self-defense, as I am about to define that defense for you, then the Government must prove beyond a reasonable doubt that that version is not correct. That is that the defendant did not act in self-defense.

The trial judge's self-defense instruction continued for another four pages of the transcript. She defined self-defense, deadly force, and excessive force; discussed action in the heat of passion; the role of the aggressor; and then summarized her self-defense instruction.

In contrast to the trial court's conditional self-defense instruction, criminal jury instruction No. 4.18 in the Red Book reads:

Self-defense is a complete defense to murder and manslaughter. The government must prove beyond a reasonable doubt that the defendant did not act in self-defense. If it does not, you must find the defendant not guilty of both degrees of murder and of manslaughter.

CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 4.18 (4th ed.1993). In addition, the concluding paragraph of criminal jury instruction No. 5.12 relating to "Self–Defense—General Considerations" states:

Where evidence of self-defense is present, the government must prove beyond a reasonable doubt that the defendant did not act in self-defense. If the government has failed to do so, you must find the defendant not guilty.

*Id.*, No. 5.12.

Under the plain error standard, the alleged error must be "obvious and readily apparent" under current law. *Baxter v. United States*, 640 A.2d 714, 717 (D.C. 1994) (citation omitted). In addition, an appellant must show that the alleged error is " 'so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial.' " *Brown v. United States*, 763 A.2d 1137, 1142 (D.C. 2000) (citations omitted). We have also said that "reversal is warranted only in exceptional circumstances where a miscarriage of justice would otherwise result." *Robinson v. United States*, 649 A.2d 584, 586 (D.C.1994) (internal quotations and citations omitted).

Here, not only did the trial court spend considerable time in giving the self-defense instruction to the jury, but a substantial part of the instruction conformed to the Red Book self-defense instructional provisions. It may have been wiser for the trial judge to adhere to the Red Book provisions without variation, but defense counsel raised no objection. Indeed, he stated: "I don't see that the Court's modifications significantly or materially change[] my client's rights or my arguments." Furthermore, viewing the self-defense instruction in its entirety, we cannot say on the record before us that deviation from the Red Book constituted obvious and readily apparent error. The judge, as defense counsel requested, instructed the jury, without equivocation, that: "The government must prove beyond a reasonable doubt that the defendant did not act in self-defense." Moreover, we see no significant difference between the conditional words used by the trial judge, "if evidence of self-defense is present," and those in criminal jury instruction No. 5.12, "where evidence of self-defense is present." Furthermore, even assuming that the first prong of the plain error test has been met, we detect no prejudice to Mr. Lopez's substantial rights that would call into question the fairness and integrity of his trial because of the self-defense jury instruction. Nor do we discern any miscarriage of justice. In *Myles v. United States*, 364 A.2d 1195 (D.C.1976), we rejected a similar argument that a condition-

al variation in the self-defense instruction required reversal of appellant's conviction.[17] Similarly, we see no reason to reach a different conclusion in the case before us.

Accordingly, for the foregoing reasons, we reject the contentions raised in Mr. Lopez's direct appeal, but remand this case to the trial court for a hearing on his D.C.Code § 23–110 motion and a determination as to whether a new trial is required because of ineffective assistance of trial counsel. At the hearing on remand, all of Mr. Lopez's § 23–110 allegations should be re-examined.

*So ordered.*

---

**17.** In *Myles, supra,* the challenged sentences specified: "You must be satisfied that evidence of self defense is present. In this case, if you find no evidence of self defense present, that ends your consideration." *Id.* at 1197. We declared that: "Although we find the language of the standardized instruction to be preferable, we do not find the instruction as given to amount to reversible error under the circumstances of this case." *Id.* Although *Myles* may be distinguishable on the ground "that there was little, if any, evidence of self-defense ....," *id.* at 1198, we are satisfied that in Mr. Lopez's case, where there was some evidence of self-defense, that the "slight variation [in the self-defense jury instruction] did not constitute reversible error." *Id.*