Gilfredo LOPEZ, Appellant,

v.

UNITED STATES, Appellee.

No. 03–CO–88.

District of Columbia Court of Appeals.

Argued Feb. 24, 2004.

Decided Dec. 30, 2004.

Paul Y. Kiyonaga, with whom Debra L. Soltis was on the brief, for appellant.

John P. Gidez, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney at the time the brief was filed, and John R. Fisher, Roy W. McLeese III, Anthony Asuncion, and Carolyn K. Kolben, Assistant United States Attorneys, were on the brief, for appellee.

Before TERRY, GLICKMAN, and WASHINGTON, Associate Judges.

WASHINGTON, Associate Judge:

Appellant Gilfredo Lopez ("Lopez") appeals the trial court's denial, following a hearing on remand, of his motion pursuant to D.C.Code § 23–110 (2001) to vacate and set aside his convictions for second-degree murder while armed,[1] assault with intent to kill while armed,[2] possession of a firearm during a crime of violence or dangerous offense,[3] and carrying a pistol without a license.[4] Specifically, Lopez contends that his trial attorney rendered ineffective assistance because he failed to interview and call as trial witnesses two individuals whose testimony, he argues, had a reasonable probability of altering the outcome of the trial.[5] Finding no merit to Lopez's claim of ineffective assistance of counsel, we affirm.

## I.

On December 23, 1995, a group of individuals, including Gilfredo Lopez and Ruben Flores ("the decedent"), were involved in an altercation at the Tracks nightclub and told to leave the premises. As Lopez drove away in a white Honda Civic,[6] the decedent and his cousin, Carlos Flores ("Flores"), chased after him in a Toyota Forerunner. During the brief chase, the decedent rolled down the passenger side window and threw beer bottles at the Honda. Although Lopez allegedly fired a "warning shot," the Flores cousins continued to pursue him. The chase ended soon after it began, with both vehicles coming to a stop a few blocks away from the nightclub. Flores testified that he stepped out of the Forerunner, walked about five feet toward Lopez's car, and heard the decedent yell at him to get back into the truck. Next, Flores testified that Lopez raised his hand out the driver-side window and fired a shot that hit, but did not penetrate, the Forerunner's windshield. According to Flores, Lopez then got out of the Honda and fired more shots at the Toyota Forerunner. As Lopez approached, still firing shots, Flores rushed back inside the Forerunner to avoid being hit. One of the bullets hit the side of the Forerunner near the engine; another broke the passenger door window, spreading glass all over the passenger seat. The decedent was fatally injured when one of the bullets passed through the upper portion of his left arm and became lodged in his right lung. According to the medical examiner who testified on behalf of the government, the decedent had been shot from about five feet

1. In violation of D.C.Code §§ 22–2403, –3202 (1996), recodified at D.C.Code §§ 22–2103, –4502 (2001).

2. In violation of D.C.Code §§ 22–501, –3202 (1996), recodified at D.C.Code §§ 22–401, –4502 (2001).

3. In violation of D.C.Code § 22–3204(b) (1996), recodified at D.C.Code § 22–4504(b) (2001).

4. In violation of D.C.Code § 22–3204(a) (1996), recodified at D.C.Code § 22–4504(a) (2001).

5. At the beginning of his brief to this court, Lopez frames the "issue presented" as whether trial counsel provided ineffective assistance by "failing to secure the presence of *two* critical fact witnesses" (presumably Nelson Reyes and Miguel Sandoval) and an expert witness (Hal Sharpe). The remainder of his brief, however, focuses only upon counsel's failure to call Reyes and Sharpe, thereby abandoning his argument with respect to Sandoval. *See Bardoff v. United States*, 628 A.2d 86, 90 n. 8 (D.C.1993) (citing D.C.App. R. 28(a)(5)) (when appellants "provide no supporting argument in their brief for [a] general assertion," we treat the argument as "abandoned").

6. Co-defendant Raul Lopez–Gonzales was a passenger in Lopez's car.

away. Although he could not describe the decedent's exact position when he was shot, Flores testified that the decedent had never exited the Forerunner.

Once Flores realized that his cousin had been shot, he began driving around in search of help. After alerting the police to what had happened, Flores followed the officers as they pursued Lopez's Honda. Flores stopped his vehicle four blocks away from the scene of the shooting, in the 100 block of M Street where the police had apprehended Lopez. There, the decedent was removed from the Forerunner, and a firefighter administered CPR until the paramedic and ambulance arrived to take him to the hospital.

Although Lopez admitted to shooting and killing the decedent, he maintained that the shooting was in self-defense. At trial, he testified that he recognized the Flores cousins from the earlier fight at Tracks and believed they were chasing him in retaliation for that altercation. Lopez explained that he was afraid when the cousins continued pursuing his vehicle even after he fired a warning shot. Lopez testified that he was forced to stop his car behind stalled traffic and felt that he had to take some defensive action against his pursuers. When he saw the Toyota Forerunner's passenger and driver-side doors open, Lopez believed the cousins were coming after him. Lopez testified at trial, "I got out of my car. I seen [sic] both Carlos and Ruben's doors open.... At the time I was in fear. I didn't know whether they were hurting me. So I grabbed my gun with both hands and I fired at the windshield, first shot." Lopez allegedly fired these shots "to scare them off." He testified that when Flores returned to his car, he did not know whether Flores was

fleeing the gunfire or retrieving a weapon of his own. In response, Lopez "fired and fired." Lopez claimed that he fired at the passenger side door only when he saw it open and the decedent "was making an intent to come out." Lopez further testified that he "didn't see [the decedent] come out all the way," that he never saw the decedent's hands or body, and that the decedent was "half inside and half outside" when the bullet hit him. Lopez testified that he never meant to shoot the decedent. Rather, he shot at the passenger door in the hopes of scaring the Flores cousins away.

## A. Lopez's § 23–110 Motion

Following his convictions at trial, Lopez filed a § 23–110 motion alleging that trial counsel was constitutionally deficient because he failed to call at trial two exculpatory eyewitnesses, Nelson Reyes ("Reyes") and Miguel Sandoval ("Sandoval"), along with expert witness Hal Franklin Sharpe ("Sharpe").[7] According to Lopez, these witnesses would have offered testimony to support his theory of self-defense by corroborating his claim that the decedent was coming out of the car at him when he fired the fatal shot. Reyes and Sandoval were acquaintances of Lopez who happened to be driving behind the decedent's Forerunner at the time of the shooting. Reyes' affidavit indicated that during the chase, he

> saw the passenger in the Toyota truck throw beer bottles at the Honda. When the cars stopped, Mr. Reyes "observed [Mr.] Lopez exit the Honda, at the same time that both the driver and passenger [that is the decedent, Mr. Ruben Flores] in the Toyota were exiting that car." He "recall[ed] specifically that the pas-

---

7. Lopez's § 23–110 motion also alleged that trial counsel was deficient for failing to prepare him adequately to testify and to develop a coherent strategy to deal with his gang affiliation.

senger in the Toyota had opened his door and was getting out of the car." He added: "It appeared that the occupants of the Toyota were getting out to fight with the occupants of the Honda, in that both occupants opened their doors quickly and forcefully immediately after the Toyota had come to a stop."

*Lopez v. United States ("Lopez I")*, 801 A.2d 39, 44 (D.C.2002) (alterations in original). Sandoval similarly stated in his affidavit that after the cars stopped, he "witnessed the passenger of the [Forerunner] open his door and get out very quickly, as if he were about to get into a fight." *Id.* In addition to the two eyewitnesses, Lopez claimed that trial counsel erred in failing to call expert witness Sharpe, "a specialist in the scientific investigation of alleged homicides." *Id.* at 45. Sharpe had been hired by Lopez's former attorney Heather Shaner to provide expert testimony at trial. Lopez's subsequent trial counsel, however, decided not to use Sharpe as a witness. Sharpe's affidavit indicated that, had he been called at trial, he "would have testified, to a reasonable degree of scientific certainty, that the decedent/passenger of the Toyota Forerunner was *not* seated in that vehicle at the time he was shot." *Id.* at 45 (emphasis in original).

Trial counsel Terrence O'Connor ("O'Connor") submitted an affidavit of his own, explaining his reasons for not calling these three witnesses. O'Connor explained that he did not call Reyes as a witness because, although he saw both the passenger and driver side doors open, Reyes "did not see anyone get out." *Id.* at 43. O'Connor believed this would contradict Lopez's claim that the passenger exited the car. With respect to Sandoval,

O'Connor averred that he decided not to put him on the stand because Sandoval had a criminal record and would have testified, contrary to Reyes, that the passenger door of the Toyota did not open.[8] In addition, O'Connor was wary of "'using friends and family as witnesses' because they could 'damage' the case." *Id.* at 44. Finally, O'Connor's affidavit stated that he did not call Sharpe because "his proposed testimony that 'the passenger had gotten out of the car' would conflict with that of Mr. Reyes and Mr. Sandoval." *Id.* at 45.

Crediting trial counsel's justification for not calling these witnesses, the trial court denied Lopez's § 23–110 motion without holding a hearing. On appeal from that decision, we concluded that the trial court's failure to hold a hearing was error. *Id.* at 46. We said that the affidavits of both eyewitnesses, if true, corroborated Lopez's claim that the decedent was in the process of exiting the Toyota when Lopez fired his shots at the car. *Id.* at 45–46. Moreover, we found that Sharpe's affidavit "would have established that Ruben Flores could not have been seated in the Toyota truck when he was fatally wounded." *Id.* If true, these affidavits tended to refute the testimony of key government witnesses, including the decedent's cousin, who claimed that the decedent had never left his seat. Ultimately, we concluded, "[t]here is a reasonable probability that the testimony of Mr. Reyes, Mr. Sandoval[,] and Mr. Sharpe, if consistent with their affidavits and believed by reasonable jurors, would have affected the outcome of the case because of its tendency to support Mr. Lopez's self-defense theory." *Id.* at 46. Therefore, we remanded the case so

8. This conclusion was based on trial counsel's review of the case materials inherited from Lopez's prior counsel, Heather Shaner. Shaner had hired private investigator Arnold Giesemann to interview potential witnesses, including Reyes and Sandoval, and Giesemann's notes were among the records relied upon by counsel.

that the trial court could hold a hearing on the merits of Lopez's § 23–110 motion.

## B. The hearing on Lopez's § 23–110 Motion

Six witnesses testified at Lopez's § 23–110 hearing on July 11, 2002 and August 2, 2002. These witnesses included Shawn Moore ("Moore"), one of three attorneys who had preceded Terrence O'Connor as trial counsel in this case, Arnold Giesemann ("Giesemann"), a private investigator hired by another of Lopez's former attorneys to interview potential witnesses, eyewitnesses Reyes and Sandoval,[9] expert Sharpe, and trial counsel O'Connor.

### 1. Shawn Moore's Testimony

Shawn Moore was appointed in February 1997 as Lopez's second attorney in this case. According to his testimony at the § 23–110 hearing, Moore interviewed Nelson Reyes for approximately fifty minutes in March 1997. Based on his notes and recollections of that interview, Moore testified that Reyes had told him that he had been in the bathroom at the Tracks nightclub when the altercation occurred. Reyes told Moore that he left the club soon after and as he was driving away, he saw Lopez drive around him, followed by another vehicle that seemed to be chasing Lopez's car. Reyes told him that both cars stopped at a stop sign, Lopez got out of his car, and came within twenty feet of the passenger side of the vehicle that had been chasing him. At that point, Lopez opened fire, then got back inside his car and drove away. Although Moore could not recall whether he had specifically *asked* Reyes if he saw anyone getting out of the other vehicle, he testified that Reyes had never

told him that he saw anyone getting out of that vehicle. After interviewing Reyes, Moore concluded that he "didn't think Mr. Reyes was helpful in the nature of self-defense, with the exception of corroborating the fact that there had been a chase." Moore testified that he had told Lopez he "didn't think [Reyes] was going to help us a whole lot." Although he had not communicated these conclusions to Terrence O'Connor, Moore testified that he placed the memo summarizing his meeting with Reyes in the case file that he turned over to Lopez's subsequent attorney, Heather Shaner, who entered an appearance in the case on April 24, 1997.

### 2. Arnold Giesemann's Testimony

Private investigator Giesemann, hired by attorney Shaner to interview witnesses for Lopez's defense, also testified at the § 23–110 hearing. Giesemann had interviewed both Reyes and Sandoval and offered testimony and notes regarding his 1997 interviews with both witnesses. Giesemann recalled that he had interviewed Reyes on August 3, 1997 and prepared a report memorializing the interview for Shaner. During the interview, Reyes reiterated that he had been in the bathroom during the altercation at Tracks, and that he left along with the other patrons who had been ejected. Reyes told Giesemann that he pulled out of the parking lot onto First Street, crossed M Street going north, and then pulled to the side of the street waiting for Lopez to catch up with him. At that point, Reyes told Giesemann that he heard a gun shot before Lopez drove past him, tailed by the Forerunner. Reyes recounted that the Forerunner stopped *beside*[10] Lopez's car at a

9. Because Lopez has abandoned his ineffectiveness claim regarding trial counsel's failure to call Sandoval as a witness, we refer to Sandoval's hearing testimony only to the ex-

tent that it relates to trial counsel's decision not to call Reyes and Sharpe as witnesses.

10. Sandoval, by contrast, had told Giesemann that the cars stopped one *behind* the other.

stop sign at First and L Streets.[11] Reyes told Giesemann that he saw both the driver and passenger doors of the Forerunner open.[12] In contradiction to Reyes' 1999 affidavit, however, Reyes told Giesemann that he did *not* see anyone get out of that vehicle. Although Giesemann wrote in his memorandum that Reyes came across as honest and would probably make a good witness, he added, "[b]ut *hopefully,* fuzzy on details." When asked at the hearing to elaborate on this notation, Giesemann explained that Reyes' account included details that seemed wrong. Giesemann's report opined that, sitting in the driver's seat, Reyes would not have been able to see the passenger side of the Forerunner as he claimed. Giesemann's reports to attorney Shaner also highlighted the numerous discrepancies between Reyes' and Sandoval's eyewitness accounts of the shooting.[13]

### 3. Nelson Reyes' and Miguel Sandoval's Testimony

At the 23–110 hearing, both Reyes and Sandoval adopted their 1999 sworn affidavits as true and accurate accounts of what their trial testimony would have been. Reyes added that he saw the decedent throwing beer bottles at Lopez's car. He recounted that he had stopped his car behind and slightly to the right of the

Forerunner and saw both occupants of that vehicle "opening the door" and getting out. Reyes claimed that he saw the decedent's "whole body" come out of the car before Lopez fired his shots. Reyes could not remember having told anyone that he did not see the decedent leave the truck, and could not specifically recall having spoken with either Moore or Giesemann.

### 4. Hal Franklin Sharpe's Testimony

At the § 23–110 hearing, expert Sharpe adopted his February 2000 affidavit, in which he opined that the decedent was not seated in the passenger seat when he was shot. Sharpe testified that, in preparing his expert opinion for the Lopez case, he met with Attorney Shaner on several occasions, "reviewed the police reports, all of the crime scene photographs, sketches, the medical examiner's report[,] and the evidence reports," and examined both a sweater and a light-colored shirt which had been collected by the police as evidence and sealed in evidence bags. Sharpe testified that he examined the sweater with a magnifying glass and used a microscope on "the parts of the sweater that were closest to the cut area where the entrance wound would have been."

In forming his opinion, it appears that Sharpe relied heavily on photographs taken four blocks away from the scene of the

11. Giesemann's investigation revealed that there had never been a stop sign at this location. Sandoval told Giesemann that he did not recall seeing a stop sign on First Street and said there was no traffic in front of Lopez's car to cause him to stop. This latter statement would have contradicted Lopez's testimony at trial that he was forced to stop by stalled traffic.

12. Sandoval told Giesemann that as he watched, he saw that the passenger side door of the Forerunner did *not* open. This original statement to Giesemann contrasts sharply with Sandoval's 1999 affidavit wherein he claimed not only that the passenger door

opened, but that the passenger aggressively jumped out.

13. See notes 8 through 10, *supra* (referring to the following contradictions between Reyes' and Sandoval's statements to Giesemann: (1) while Reyes said the cars stopped *beside* one another, Sandoval said they stopped *behind* one another; (2) while Reyes said the cars stopped at a stop sign, Sandoval said there was no stop sign; (3) while Reyes said both of the Forerunner's front doors opened, Sandoval said specifically that the Forerunner's passenger door did *not* open).

shooting, at the location where the decedent was pulled from the Forerunner.[14] When asked to state the basis for his opinion that the passenger door was open at the time of the shooting, Sharpe explained that the location of the broken glass in the photographs was highly significant.

> As to whether the door itself was open, there's a high probability that the door was open based upon the glass that's on the ground below the vehicle. It was present in the crime scene photographs if you take a look at them.

When questioned regarding the basis for his opinion that the passenger seat was empty at the time of the shooting, Sharpe again relied on the photographs. According to Sharpe,

> if someone had been seated in that car at the time that that glass was broken, then there should have been a lack of glass on the seat, particularly on the bottom seat cushion, because that glass would have landed on the individual as opposed to all over that seat and it was fairly uniform across the bottom seat cushion.
>
> . . . .
>
> [T]he fact that there's a fair amount of glass on the running board and also on the ground indicates to me that if it was a bullet that caused that glass to shatter, then the door had to be at least partially open at the time that the bullet hit the glass in order for these patterns of glass that you see on the running board and also on the ground to be here.

Sharpe also testified that the absence of glass fragments from the decedent's sweater meant that the decedent was not likely sitting next to the glass at the time of the shooting. Sharpe noted, however, that the lack of glass on the sweater was not determinative of where the decedent was located at the time of the shooting. When asked what conclusion he was able to draw from the lack of glass on the sweater, he replied, "Well, none specifically from the sweater itself. The sweater is just one contributing factor." When the trial court asked Sharpe how far from the window the decedent could have been to avoid getting glass on his sweater, Sharpe said "[i]ts impossible for me to tell without conducting experiments under similar circumstances." Sharpe did opine, however, that the decedent could have been no *nearer* than eighteen inches from the window to avoid being showered with glass fragments.

### 5. Trial Counsel Terrence O'Connor's Testimony

Terrence O'Connor assumed the role of Lopez's trial counsel on March 10, 1998. At the 23–110 hearing, he testified that he had been a practicing attorney for thirty-two years and during his career had defended numerous murder cases. Although O'Connor recalled having spoken to Reyes prior to the trial, he decided not to re-interview that witness after reviewing the case file, which included memoranda prepared by Giesemann and Moore. O'Connor offered two explanations for this decision: first, in his experience, witnesses would often change their stories over time, and second, he felt that re-interviews were unnecessary when the first interview established that the witness would not be helpful to his case. O'Connor explained that Reyes' testimony would not have been useful because Reyes' statement to Gies-

---

**14.** It is unclear whether Sharpe knew that these photographs had not been taken at the scene of the shooting. His description of the photographs as "crime scene" photographs implies, however, that he was unaware that the photographs had been taken at the scene of the arrest.

emann (that he did not see anyone get out of the passenger door) would have contradicted Lopez's testimony that the decedent came out of the passenger door. Further, O'Connor testified that he was hesitant about calling Reyes because Reyes appeared to be either a friend or personal acquaintance of Lopez and, therefore, was likely biased.

Nevertheless, O'Connor admitted that Reyes' testimony could have supported Lopez's claim that the passenger door of the Forerunner opened. O'Connor conceded that the issue of whether the door was open was not a minor one. During the trial, O'Connor had even referred to Reyes as a "critical witness" [15] and requested that the trial court issue a bench warrant to bring him in. O'Connor also testified, however, that during trial he was worried that using Reyes to establish that the door was open would "run the risk of exposing [Reyes'] entire statement" (that he didn't see anyone get out of the car) to the jury. O'Connor concluded that Reyes ceased to be a "critical" witness once Lopez took the stand and testified that the door was open and the decedent came out.

O'Connor also testified regarding his decision not to call Sharpe as an expert witness. Although O'Connor was aware that Sharpe would have testified that the decedent was not sitting in the passenger seat when he was shot, and that the passenger door of the Forerunner had likely been open when the bullet shattered the window, O'Connor had only spoken with Sharpe once during his trial preparation. O'Connor conceded that Sharpe's expert opinion that the decedent was not in the passenger seat would have been important, if true. O'Connor questioned the validity of Sharpe's conclusions, however, in light of the conflicting testimony of eyewit-

nesses Reyes and Sandoval who both established that no one exited the passenger door of the car. Thus, O'Connor felt that putting on Sharpe's testimony would have been "misleading the jury." Shortly after making these statements, when asked why he had explicitly mentioned the glass on the seat in his closing argument to the jury, O'Connor answered that he was not sure.

## C. The Trial Court's Denial of the § 23–110 Motion

On November 1, 2002, the trial court issued an order denying Lopez's § 23–110 motion alleging ineffective assistance of counsel because Lopez had not established prejudice. Based on the evidence presented at the hearing, the trial court was "convinced" that

> Miguel Sandoval and Nelson Reyes did not in fact see the decedent open his door and get out of the [Forerunner] in a threatening manner. Their 1999 affidavits, which are inconsistent with their statements to Giesemann, are incredible. Consciously or unconsciously, they have tailored their account of this 1995 event to help Gilfredo Lopez's defense.

In the trial court's view, the "best evidence" of how Reyes and Sandoval would have testified had they been called at trial were the statements each had made in 1997 to attorney Moore and investigator Giesemann. The court concluded that Lopez had not been prejudiced by the failure to call these two witnesses because "if Sandoval and Reyes both testified consistent with their statements to Giesemann they would have weakened Lopez's own version by giving contradictory testimony. If they testified consistent with their affidavits, impeachment would have seriously

---

**15.** At the hearing, O'Connor could not recall why he had referred to Reyes as "critical" and opined that he may have been speaking out of "an abundance of caution."

weakened their credibility and in turn have cast doubt on Lopez's credibility."

Likewise, the trial court found that Lopez had not been prejudiced by trial counsel's decision not to call expert Hal Sharpe. The court found that Sharpe's opinion was "neither necessary nor persuasive" because no expert was needed for counsel to argue, based on the photographic evidence and the autopsy report, that the door was open and the decedent was not sitting in the passenger seat at the time of the shooting. The court also found Sharpe's opinions to be of questionable value because "they were based on photographs taken *after* the [Forerunner] had traveled several blocks away from the shooting and had been disturbed by emergency workers." Further, the court found that because the real issue in dispute at trial was whether Lopez reasonably believed that the decedent was aggressively coming toward him, "corroboration of Lopez's testimony that the door was open and that the decedent was getting out was not necessary."

## II.

■ On appeal, Lopez contends that the trial court erred in ruling that his attorney was not constitutionally deficient for failing to interview or call at trial eyewitness Reyes and expert Sharpe. The trial court's determination that Lopez's counsel was not constitutionally deficient presents a mixed question of law and fact. *See Byrd v. United States*, 614 A.2d 25, 30 (D.C.1992) (citing *Curry v. United States*, 498 A.2d 534, 540 (D.C.1985)). We review the trial court's legal conclusions *de novo*, but accept the trial court's factual findings unless they lack evidentiary support in the record. *See Byrd*, 614 A.2d at 30 (citing *Curry*, 498 A.2d at 540). While we defer to those findings of fact that are directly related to the judge's presence in the

courtroom, findings based on documents or other writings do not merit nearly as much deference, if any at all. *Id.* (citing *In re S.G.*, 581 A.2d 771, 774–75 (D.C.1990)).

■ Lopez can prevail on his ineffective assistance of counsel claim only if he demonstrates both that counsel's performance was constitutionally deficient, and that the deficient performance prejudiced his defense. *Byrd*, 614 A.2d at 29 (citing generally *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). To establish constitutionally deficient performance, Lopez must show that counsel's " 'representation fell below an objective standard of reasonableness.' " *Walls v. United States*, 773 A.2d 424, 433 (D.C.2001) (quoting *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052). To establish prejudice, Lopez must show that " 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Id.* (quoting *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052). Ultimately, Lopez must convince us that " 'counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' " *Id.* (quoting *Strickland*, 466 U.S. at 686). On this, Lopez bears a heavy burden.

■ When assessing the reasonableness of counsel's decision not to interview or call at trial Reyes and Sharpe, we consider the totality of the circumstances as they existed at the time those decisions were made. *See Curry*, 498 A.2d at 540; *see also Strickland*, 466 U.S. at 690, 104 S.Ct. 2052. Our review is " 'highly deferential' " and we " 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " *Walls*, 773 A.2d at 433 (quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052). "[T]he decision

to call witnesses is a judgment left almost exclusively to counsel." *Smith v. United States,* 454 A.2d 822, 825 (D.C.1983) (citation and internal quotation marks omitted). Where a witness is of minimal value to the defense, it is not unreasonable for an attorney to forego the use of that witness at trial. *See Walls,* 773 A.2d at 434; *see also Parker v. United States,* 601 A.2d 45, 53 (D.C.1991) (stating that we will not "second guess" the tactical decision of trial counsel not to call a witness where counsel believes that witness's testimony would be more inculpatory than exculpatory).

■ We first consider counsel's decision not to call eyewitness Nelson Reyes to testify at trial. Relying upon the 1999 affidavit in which Reyes claimed to have seen the decedent aggressively exiting his car before the fateful shots were fired, Lopez argues that the failure to call Reyes as a witness was both objectively unreasonable and prejudicial to his self-defense claim. Even though the trial court discredited Reyes' 1999 affidavit, we are satisfied that even had Reyes been called as a witness, the outcome of the trial would not have been different.

Although it is true that a portion of Reyes' statement would have supported Lopez's case (by establishing that the passenger door was open), the remainder of his statement (that he did not *see* the decedent get out of the car) was potentially harmful. A reasonable juror might well have inferred from Reyes' statement that the decedent, in fact, did *not* get out of the car, as Lopez later claimed when he took the stand. At the hearing, it came to light that Reyes had made statements in 1997 that flatly contradicted the assertions

made in his 1999 affidavit. When attorney Moore questioned Reyes, Reyes said absolutely nothing about the passenger door being open or about the decedent exiting the car. Moreover, when questioned by private investigator Giesemann, Reyes claimed that he did *not* see anyone get out of the Forerunner when the passenger door opened. Indeed, at the § 23–110 hearing, trial counsel suggested that this was one of the reasons he hesitated to use Reyes as a witness.[16]

■ We turn next to Lopez's claim that trial counsel was ineffective for failing to call Sharpe to testify. According to Lopez, had Sharpe testified, he would have provided "scientific corroboration" of Lopez's claim that the decedent was not seated in the car when he was fatally shot. Because Sharpe's testimony would have supported his theory of self-defense, Lopez argues that it was objectively unreasonable for trial counsel not to call Sharpe as an expert witness and that, had Sharpe testified, the outcome of the trial would likely have been different. Because we conclude that Lopez was not prejudiced by trial counsel's failure to call Sharpe, we need not decide whether counsel erred in failing to put him on the stand. *See Strickland,* 466 U.S. at 691, 104 S.Ct. 2052 ("An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.").

To establish prejudice, Lopez relies heavily on our observation in *Lopez I* that if Sharpe, Reyes, and Sandoval had *all* testified "consistent with their affidavits and [were] believed by reasonable jurors," there is a reasonable probability that the outcome of the case would have been dif-

---

**16.** In his brief, Lopez argues that trial counsel's stated reasons for not calling Reyes were unpersuasive because at trial he referred to Reyes as a "critical" witness. Regardless of

why trial counsel chose not to put Reyes on the stand, Reyes' testimony was not likely to have made a difference in the outcome of the trial.

ferent. *Lopez I,* 801 A.2d at 46. Despite its apparent significance, this observation was based on the bare contents of the defense witnesses' affidavits, with the express understanding that an evidentiary hearing was necessary to resolve the factual issues raised therein. *Id.* As we previously discussed, the trial court's evidentiary hearing in this matter raised significant questions about the probative value of Reyes' testimony, especially given the potential impeachment based on his statements in 1997, and we are not convinced that Sharpe's testimony alone had a reasonable probability of altering the outcome of the trial. This is particularly so because the evidence presented at the Section 23–110 hearing casts serious doubts upon the reliability of Sharpe's opinion.

At the hearing and presumably at trial, Sharpe would have testified that at the time of the shooting, the passenger door of the Forerunner was open and the decedent was not in his seat. Sharpe based his opinion about the decedent's location at the time of the shooting on his review of photographs taken at the scene of the arrest and his examination of the decedent's sweater. In the arrest scene photographs of the Forerunner, shards of glass could be seen on the passenger seat, on the floor, in the door jamb, and, most tellingly, on the ground outside of the vehicle. Based on the location of the glass in these pictures, Sharpe opined that the door had to have been open at the time of the shooting, otherwise the glass would not have fallen where it lay.[17] Had these pictures been taken at the scene of the shooting, immediately after the fateful shots were fired, they might have formed a reliable foundation for Sharpe's expert opinion. However, the photographs Sharpe relied upon for his expert opinion were taken *after* the Forerunner had traveled four blocks from the scene of the shooting and after the decedent's door had been opened by paramedics who forcibly removed the decedent from the passenger seat of the vehicle in an effort to save his life.[18] To the extent that Sharpe's opinion was based on the absence of glass shards from the decedent's sweater, we note that Sharpe himself admitted he could draw no conclusion from this evidence alone. The sweater was "just one contributing factor" to his otherwise flawed conclusion. Because Sharpe's expert opinion relied in significant part on the location of the glass fragments in the photographs, which he erroneously believed had been taken at the scene of the shooting, Sharpe's testimony was of questionable admissibility because the probative value of that testimony would have been significantly outweighed by its potential to mislead the jury. *See generally Ibn–Tamas v. United States,* 407 A.2d 626, 639–40 (D.C.1979).[19]

---

17. At the hearing, Sharpe had claimed that "the fact that there's a fair amount of glass on the running board and also on the ground indicates to me that if it was a bullet that caused that glass to shatter, then the door had to be at least partially open at the time that the bullet hit the glass in order for these patterns of glass that you see on the running board and also on the ground to be here."

18. According to the trial court, Lopez "himself testified that after the shooting the decedent settled back into the truck and was sitting on the passenger seat when the police opened the door."

19. Although the trial court did not expressly state that it would have excluded Sharpe's expert testimony as more prejudicial than probative, the court's disdain for and complete rejection of the expert's testimony leads us to believe that the trial court ultimately may have reached that conclusion. As this court has often recognized, " '[t]he evaluation and weighing of evidence for relevance and potential prejudice is quintessentially a discretionary function of the trial court, and we owe a great degree of deference to its decision.' " *Nixon v. United States,* 728 A.2d 582, 594 (D.C.1999) (quoting *Johnson v. United*

We are satisfied, however, that even if trial counsel had called Sharpe as an expert witness and the trial court had allowed Sharpe to testify, the fundamental weaknesses in Sharpe's opinion would have been revealed during cross-examination. In fact, the trial court expressed the likely sentiment of all of the jurors when it stated that "Mr. Sharpe's willingness to express ... an opinion based on the [arrest scene] photographs defense counsel showed to him at the hearing seriously undermined his overall credibility as a crime scene expert." Because the factual underpinnings of Sharpe's opinion would have so easily been discredited on cross-examination, we are satisfied that a reasonable juror would not have given his opinion much, if any, weight. Therefore, we conclude that trial counsel's failure to call Hal Sharpe as an expert witness would not, in all reasonable probability, have affected the outcome of the trial. *See Strickland*, 466 U.S. at 694, 104 S.Ct. 2052.

*Affirmed.*

---

*States*, 683 A.2d 1087, 1095 (D.C.1996) (en banc) (citations omitted); *cert. denied*, 520 U.S. 1148, 117 S.Ct. 1323, 137 L.Ed.2d 484 (1997)).