**Colie L. LONG, Appellant,**

**v.**

**UNITED STATES, Appellee.**

**Nos. 98-CF-1088, 98-CF-1425, 04-CO-1503.**

District of Columbia Court of Appeals.

Argued June 8, 2006.

Decided Nov. 9, 2006.

---

Richard S. Stolker, for appellant.

John P. Gidez, Assistant United States Attorney, with whom Kenneth L. Wainstein, United States Attorney at the time the brief was filed, and Roy W. McLeese III, and Kathleen M. O'Connor, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN, Associate Judge, and BELSON and Schwelb, Senior Judges.*

GLICKMAN, Associate Judge:

Appellant Colie L. Long was indicted initially on charges of first-degree premeditated murder while armed, assault with a dangerous weapon, possession of a firearm during a crime of violence, and carrying a pistol without a license (CPWL). The jury in his first trial found him guilty of CPWL but could not reach a unanimous verdict on the other charges, as to which a mistrial was declared. The grand jury thereafter returned a superseding indictment, adding a count of conspiracy to commit murder to the three remaining charges from the original indictment. After a second trial, Long was convicted on all four counts. His subsequent motion to vacate his convictions pursuant to D.C.Code § 23–110 (2001) on grounds of ineffective assistance of trial counsel was denied. We have consolidated Long's appeal from that denial with his direct appeals of his convictions.

We are not persuaded by Long's claims on direct appeal that he was denied his Sixth Amendment right to a speedy trial and deprived of a fair trial on the superseding indictment by the prosecutor's improper appeal to the jury in her rebuttal closing argument. We conclude, however, that the trial court abused its discretion by denying Long's § 23–110 motion without a hearing.

## I. The Evidence at Trial

According to the government's evidence at the second trial, Long shot and killed fourteen-year-old Ronald Williamson in the early morning hours of March 19, 1996. About two weeks before the murder, Williamson and his friends had threatened Long at gunpoint, struck him on the head with a gun, and stomped on his Super Nintendo video game system. Bent on revenge, Long reportedly vowed to "get [Williamson] if it's the last thing I do."

Shortly before dawn on the day of reckoning, Long awakened his friend, William Tilghman, telling him "get the gun" and "let's go do that." Together they walked to a nearby alley, where they found Williamson, who apparently was alone. According to Tilghman, Long told Williamson to turn around because "somebody was coming through the cut." Williamson turned his back to them, and Long directed Tilghman to "[g]o ahead, bust him." Tilghman hesitated, and Long took the gun from his hands and fired off half a dozen shots at Williamson himself. Williamson collapsed to the ground. Having run out of ammunition, Long bent down, hit Williamson on the head with the gun,

* Judge Schwelb was an Associate Judge of the Court at the time this case was argued. His status changed to that of Senior Judge on June 24, 2006.

and then walked up the alley to get more bullets from a box hidden under a porch. At this point, Williamson was lying on his stomach, struggling to crawl. Long "walked back down the alley and stood over top of [Williamson] and shot one time." Long then handed the murder weapon back to Tilghman, who threw it into nearby bushes; the next day, Tilghman retrieved the gun and sold it.

Although Long did not testify, the theory of his defense was that Tilghman killed Williamson by himself, and that he was lying about Long's participation in the murder in order to receive a lighter sentence. The government had secured Tilghman's testimony against Long by agreeing to let him plead guilty to the reduced charge of voluntary manslaughter while armed. On the witness stand, Tilghman admitted that he initially had lied about the shooting to the police. He also admitted having told an FBI agent that he personally discharged the murder weapon when Williamson "flinched." Tilghman claimed that admission too was a lie.

Three other government witnesses testified to hearing the gunshots and seeing Long in the alley. Two of the witnesses—Angela Wheeler and Williamson's mother Linn Thomas—claimed that they actually saw Long firing or pointing a gun at Williamson. All this identification testimony was impeached, however. Wheeler's mother testified that her daughter did not see anything that happened in the alley before the police arrived, and Wheeler herself acknowledged during cross-examination that she did not know whether it was Long or Tilghman whom she saw. Thomas admitted not telling the police that Long had shot her son because she "was thinking maybe I made a mistake, maybe that wasn't him." The defense presented evidence that Thomas was high on crack cocaine at the time of the murder, though she denied it. The third witness, Florence Green, told detectives who interviewed her immediately after the shooting that she was not able to make a positive identification "because it was dark and I saw the features of his face, not the complete face."

## II. The Speedy Trial Claim

■ We first address Long's claim that he was denied his Sixth Amendment right to a speedy trial. Long was arrested on March 19, 1996, detained without bond pursuant to D.C.Code § 23–1325(a) (1996), and indicted on November 13, 1996. His trial was scheduled for March 10, 1997, but in January of that year, Long filed a *pro se* motion requesting the appointment of new counsel to replace his existing attorney, with whom he had developed an unspecified "irreconcilable difference." The trial court granted Long's request, and his trial date was reset for May 28, 1997. On May 15, 1997, however, Long moved for a continuance to enable him to conduct additional pretrial investigation, and the trial date was pushed back to August 4, 1997. Shortly before that date, Long again moved *pro se* for the appointment of new counsel on "irreconcilable difference" grounds. (In a contemporaneous letter to the trial judge, Long articulated some generic complaints, the most specific being that his counsel had been pressuring him to plead guilty.) The granting of Long's request resulted in another postponement of his trial, this time to December 1, 1997. Because the prosecutor was in trial in another case, hearings on Long's pretrial motions did not commence until December 9, 1997.

The hearings lasted six days, until December 15, 1997. The trial court granted Long's motion to suppress the statements he made at the time of his arrest. The government appealed that ruling on January 14, 1998, but a few weeks later, it chose to dismiss the appeal. Long's trial

began on March 9, 1998. Seventeen days later, Long was found guilty of carrying a pistol without a license and a mistrial was declared on the other charges. On April 16, 1998, Long was arraigned on the superseding indictment, which Long moved to dismiss on speedy trial and due process grounds. The trial court denied the motion and Long's second trial began on June 22, 1998.

In determining whether a defendant has been deprived of his Sixth Amendment right to a speedy trial, it is necessary to consider (1) the length of the delay, (2) the reasons for the delay, (3) whether and how the defendant asserted his right, and (4) the prejudice to the defendant resulting from the delay. *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). "These factors are related and must be considered together with other relevant circumstances in a difficult and sensitive balancing process." *Hammond v. United States,* 880 A.2d 1066, 1079 (D.C.2005) (internal quotation marks and citations omitted). In the present case, we think the balance tilts decisively against Long's claim.

The two-year delay between Long's arrest and the start of his trial "clearly suffices to trigger the speedy trial enquiry." *Doggett v. United States,* 505 U.S. 647, 652, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992); *see, e.g., Hammond, supra; Graves v. United States,* 490 A.2d 1086, 1091 (D.C.1984) (en banc). Upon inspection, however, we see that a sizable portion of the delay—the seven to nine months attributable to Long's motions for new counsel and for a continuance—was "appellant's own responsibility." *Sanders v. United States,* 550 A.2d 343, 346 (D.C. 1988). In contrast, the government bore responsibility for only a few months of delay, mainly on account of its aborted interlocutory appeal. "Given the importance of appellate review to our system of justice," however, "reasonable appellate delay resulting from interlocutory appeals is considered justifiable in the speedy trial analysis." *Hammond,* 880 A.2d at 1083 (internal quotation marks and citation omitted). We also may assume that some portion of the three-month interlude between Long's two trials should be charged to the government on account of its belated decision to seek a superseding indictment, together with the eight days in December 1997 when the prosecutor was tied up in another trial. Even so, the bulk of the delay in this case was attributable to what we have called neutral, institutional reasons that do not weigh heavily against the government. *See Graves,* 490 A.2d at 1093. There is no evidence that the government noted its appeal in bad faith, engaged in "deliberate foot dragging," or attempted to hamper the defense in order to "gain a tactical advantage." [1] *Id.* at 1092.

Long never demanded that he be given a speedy trial; at most, he merely moved to dismiss the superseding indictment on speedy trial grounds because "the long delay before charging him with the Conspiracy count" allegedly prejudiced his ability to defend against that charge. Long's prolonged silence is most significant to the present calculus, because the Supreme Court has "emphasize[d] that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." *Barker,* 407 U.S. at 532, 92 S.Ct. 2182. Although Long

1. Long argues that the government could have included the conspiracy charge in the original indictment. Even if that is so, it does not establish that the government delayed adding the charge in order to gain a tactical advantage over Long or for other impermissible reasons.

claims it was "evident" in view of his pretrial incarceration and his complaints about his counsel that he was "anxious to proceed to trial," such indicia do not count as a genuine invocation of the speedy trial right and are entitled to little if any weight. *See Graves,* 490 A.2d at 1098.

Finally, on the question of whether Long was prejudiced by the lengthy pretrial delay in his case, we would not dispute that his pretrial incarceration was "oppressive" or that it exacerbated his "anxiety and concern" about his situation. *Barker,* 407 U.S. at 532, 92 S.Ct. 2182.[2] Importantly, though, there is no indication that the delay impaired Long's defense, which the Supreme Court has characterized as "the most serious" form of prejudice. *Id.* Although Long asserts on appeal that the delay dimmed the recollections of witnesses who might have testified in his behalf and presumptively prejudiced his ability to defend himself, we must discount those claims as vague and unsupported. The "absence of this most serious form of prejudice weighs heavily in our determination of whether appellant was deprived of his right." *Turner v. United States,* 622 A.2d 667, 679 (D.C.1993) (quoting *Graves,* 490 A.2d at 1103).

The more responsibility a defendant bears for pretrial delay, the less weight should be accorded the prejudicial impact of that delay. *See Sell v. United States,* 525 A.2d 1017, 1025 (D.C.1987). What therefore stands out when we balance the four *Barker* factors in this case is that Long never demanded a speedy trial and that he himself was responsible for a good portion of the delay. When we add that the remaining delay was mostly attributable to so-called "neutral" reasons, and not at all to prosecutorial bad faith, and that Long's defense was not noticeably impaired, we think it follows ineluctably that Long was not denied his Sixth Amendment right to a speedy trial.[3]

### III. Closing Argument

In her rebuttal closing argument, the prosecutor urged the jury not to "give up" on Angela Wheeler's identification of Long even though she had retreated from it during her cross-examination. After describing Wheeler as a scared, reluctant witness who was "too weak to stand up," and reminding the jury that she was only one of three people who independently identified Long, the prosecutor began to conclude as follows:

> These three separate identifications ... pointing to the defendant, in addition to the other evidence submitted to you in this case, should give you strength. Angela Wheeler didn't have the strength, but I submit to you that based on the evidence in this case, based on the common sense that each and every one of you bring to bear in this case, *you*

2. Some prejudice to a defendant in the form of anxiety is "inevitable simply by virtue of the existence of impending criminal charges." *Graves,* 490 A.2d at 1103. Consequently, "[t]o establish prejudice based on anxiety, a defendant must do more than simply make an assertion but must show that the alleged anxiety and concern had a specific impact on [his] health or personal or business affairs." *Hammond,* 880 A.2d at 1087 (internal quotation marks and citation omitted). Long has not claimed to have suffered any such particularized effects of anxiety.

3. Because Long has shown neither actual prejudice nor prosecutorial bad faith, there also is no merit to his claim—argued below but stated only in passing on appeal—that the delayed addition of a conspiracy count in the superseding indictment violated his Fifth Amendment right to due process. *See United States v. Lovasco,* 431 U.S. 783, 793, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977); *Smith v. United States,* 414 A.2d 1189, 1194 (D.C.1980).

*do have the strength to stand up and say we are not going to let you get away with the first degree murder—*

(Emphasis added.) Long's counsel interrupted with an objection, which the trial court sustained, and the prosecutor finished her rebuttal.

Summoned to the bench, Long's counsel argued that the prosecutor had improperly asked the jury to "send a message to Mr. Long." The trial judge disagreed with that characterization, but perceiving that the prosecutor "was getting close to there," the judge elected in an abundance of caution to give an immediate curative instruction. "So we're all clear," the judge told the jury,

> You will reach a verdict in this case based on the cold evidence. You won't base it on anger, on the nature of the charge, you won't base it on sympathy, you won't base it on anything but an objective decision of the facts. There's no message to send. There's no issue here. You'll evaluate in keeping with the law that I give you ... objectively, unemotionally, and clearly, and you will come to a determination based on the law as I define it.... I'm not saying anyone stepped over that, I just want to make that very clear to you....

Long contends that he is entitled to reversal because the judge's response "magnified rather than cured the impropriety" of what he asserts was a prosecutorial appeal to the jury to decide the case on the basis of emotion rather than the evidence. Inasmuch as Long did not object to the judge's curative instruction or request a mistrial, we review his contention only for plain error. *See, e.g., Metts v. United States,* 877 A.2d 113, 118 (D.C. 2005). *See also* Super. Ct.Crim. R. 30. Under the plain error standard, "reversal of a conviction based on improper prosecutorial argument is appropriate only in a 'particularly egregious' case, when 'a miscarriage of justice would otherwise result.'" *McGrier v. United States,* 597 A.2d 36, 41 (D.C.1991) (quoting *United States v. Young,* 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985)). This is not such a case.

Indeed, to begin with the threshold question, *see Parker v. United States,* 757 A.2d 1280, 1289 (D.C.2000), we are not persuaded that the challenged comment by the prosecutor was improper. It is true, as Long argues and the trial judge recognized, that we have held it to be improper for an attorney to "ask a jury to 'send a message' to anyone ... [or] to 'tell' someone something." *Bowman v. United States,* 652 A.2d 64, 71 (D.C.1994). In *Bowman,* for example, the prosecutor called upon the jury "to tell Mr. Bowman that our society won't allow that kind of behavior," and added that "to find Mr. Bowman not guilty in this case is to tell him that he can go on doing what he did, and that's okay." *Id.*[4] Such exhortations are improper, we have stated, because they "impl[y] that there is a reason to find the defendant guilty other than what the

4. *See also Coreas v. United States,* 565 A.2d 594, 604 (D.C.1989) (prosecutor improperly urged jury to return a verdict "that tells this defendant that in this country the jury decides and that the jury will not let him convict Mr. Perez and give him his own sentence, that this defendant stood at the bottom of the steps and made a conscious decision to plug Polo Perez with five shots and he can't do that here"); *Powell v. United States,* 455 A.2d 405, 410 (D.C.1982) ("Isn't it time that this jury, acting as the conscience of this community, stood up and sent a message loud and clear to James Powell, and sent that same message loud and clear to Tilman Fields, and say, we don't tolerate robberies? We don't tolerate armed robberies. Send a message to them. This community does not and cannot tolerate the robbing of its citizens.").

evidence has shown." *Id.* "Juries are not in the message-sending business. Their sole duty is to return a verdict based on the facts before them." *Id.* But the challenged statement in this case was not of the objectionable "message-sending" type, nor do we think the jury could have understood it to be a call for a decision on an emotional or other impermissible basis. The prosecutor did not speak of sending any message. She explicitly linked her request for a guilty verdict to the evidence of Long's guilt "submitted to you in this case." Her rhetoric—"you do have the strength to stand up and say we are not going to let you get away with the first degree murder"—merely drew a contrast with the witness, Angela Wheeler, who (arguably) "didn't have the strength" to stand up and repeat her truthful, independently corroborated identification of Long under the pressure of cross-examination. We see nothing improper in this.

Even if we were to assume *arguendo* that the jury could have misinterpreted the prosecutor's brief remark as an implicit invitation to decide the case on an improper basis—an assumption we do not embrace—we still would not reverse Long's conviction on that account. Generally speaking, "in determining whether prosecutorial [impropriety] infects a verdict [we must] balance ... the gravity of the [impropriety], its direct relationship to the issue of innocence or guilt, and the effect of specific corrective instructions of the trial court, if any, against the weight of the evidence of appellant's guilt." *Bowman,* 652 A.2d at 70 (citations omitted). In this case, without belaboring the question, it suffices to say that the trial judge's prompt and emphatic corrective instruction to the jury not to send any messages, but to decide the case strictly on an "objective" view of the evidence, avoided any possible prejudice to Long. In view of that instruction, we are confident that the challenged comment did not result in any miscarriage of justice.

## IV. The § 23–110 Motion

### A. Denial of the Motion

On December 24, 2003, Long filed his motion pursuant to D.C.Code § 23–110 for a new trial on grounds of ineffective assistance of trial counsel. Long complained that his defense counsel failed to present known and available exculpatory evidence and thereby "left the jury with little factual basis" on which to accept his claim that he was not responsible for Williamson's murder. Long alleged that defense counsel's performance was deficient in four specific respects.

*First,* Long charged, counsel failed to present evidence that he was "medically incapable of firing the shots that killed Ronald Williamson" because he was right handed, and his right hand was broken at the time of the murder.[5] *Second,* counsel failed to call Timothy Padgett as a defense witness, even though he was aware that Padgett "would have testified that he attempted to buy a gun from William Tilghman the day after the Williamson murder, and that while in jail on unrelated charges, Tilghman confessed to Padgett that he, Tilghman, had killed Williamson." Long appended an affidavit from Padgett to his

5. The motion stated that Long had broken his bone "from his middle finger toward his wrist" in an altercation two weeks before Williamson was murdered; that "[h]is hand was badly swollen and he was undergoing treatment at the time" and, following his arrest, at the D.C. Jail; and that "defendant's medical records were available at the D.C. Jail at the time of trial (defendant having been X-rayed at the jail in March 1996) although the records are no longer available."

motion.[6] Long also identified by name three persons who allegedly could have been called at trial to corroborate Padgett's testimony. Although he did not include their affidavits, Long stated that he intended to present the testimony of these three additional witnesses at the hearing on his motion.

*Third,* Long alleged that defense counsel failed to call Tiffany Rauch as a defense witness, despite the fact that her name was on the defense witness list. Rauch allegedly would have testified that Long was with her in her apartment at the time of the murder.[7] Long did not submit an affidavit from Rauch, however. *Fourth,* and lastly, Long complained that his counsel failed to introduce nighttime photographs of the crime scene showing that the area was not well lit.[8]

The motions judge, who was not the trial judge, did not call upon the government or Long's defense counsel to answer Long's motion. Instead, stating that Long's allegations would not entitle him to relief even if they were true, the judge denied the motion without a hearing in a written order issued on November 15, 2004. The allegedly omitted evidence "would not [have been] sufficient," the judge explained, "to rebut the evidence provided to jurors and to the court that the defendant openly spoke of planning to kill the decedent, that the defendant was seen executing the fourteen-year-old decedent by shooting him, walking away and reloading his gun, returning and firing a final shot into the decedent's head."[9] Given this evidence, the judge observed, "counsel was challenged to present a defense for this defendant," who "has found fault with every counsel that he has been provided." Therefore, the order concluded,

> [w]hile it appears as though the additional evidence [proffered by Long] is relevant to the case and could have been used in the defense's argument, it is insufficient, in conjunction with the evidence that was provided at trial, to alter

6. Padgett's affidavit, which was sworn before a notary public on September 19, 2002, included the following averments:

> 1. On March 20, 1996 I was approached by William Tilghman and James Rauch.... [Tilghman] pulled out a black revolver (Pistol) from the waist of his jeans. He (Tilghman) then asked me if [I] wanted to buy the gun from him for fifty dollars. I asked him why was he selling the gun so cheap and he (Tilghman) then stated: "I just smashed ... Man–Man [Williamson] last night and I gotta get rid of this shit."
> 2. In October 1996, I was arrested on unrelated felony charges and was taken to D.C. Jail.... William Tilghman was [also in jail] ... and I was placed on the same tier where he was.... Tilghman and I used to talk a lot with each other. And on several occasions he (Tilghman) used to tell me how he caught Man–Man (Ronald Williamson) slipping and killed him[.]
> 3. On or about the month of October, 1997 I was visit[ed] by [the defense investigator].... I then gave her the above statement and she ... asked me was I willing to testify in the case of Colie Long. I told [her] that I would testify on the behalf of the defendant Colie Long, and [she] told me that I would be Subpoenaed and be required to appear in court to give my statement. Yet I was not called as a witness to the above case.

7. According to Long's motion, Rauch "was prepared to testify that she was awakened by a gunshot, and immediately ran to the kitchen where she observed the defendant while the shooting was still occurring."

8. Such photographs allegedly would have contradicted the prosecution witnesses; without them, Long asserted, "the jury had little to preclude it from treating the momentary glances of the presumptive killer by government witnesses as conclusive identification."

9. The judge also found it "speculative at best" whether the evidence set forth in Long's motion "would have procured an innocent ruling."

the case in its entirety. As such the Court finds that the defendant's trial counsel's representation was objectively reasonable.

**B. Discussion**

"We have said many times that where the court is faced with a claim of ineffective assistance of counsel, the statute creates a presumption that a hearing should be held, especially where the allegations of ineffectiveness relate to facts outside the trial record." *Newman v. United States,* 705 A.2d 246, 261 (D.C. 1997) (internal quotation marks, brackets and citations omitted). Indeed, the statute states that "[u]nless the motion and files and records of the case *conclusively* show that the prisoner is entitled to no relief, the court *shall* cause notice thereof to be served upon the prosecuting authority, grant a prompt hearing thereon, determine the issues, and make findings of fact and conclusions of law with respect thereto." D.C.Code § 23–110(c) (emphasis added). While the decision whether to hold a hearing is committed to the trial court's discretion, *see Little v. United States,* 748 A.2d 920, 922 (D.C.2000), the scope of that discretion is thus quite narrow. "Any question regarding the appropriateness of a hearing should be resolved in favor of holding a hearing." *Newman, supra* (internal quotation marks and citation omitted). We "will affirm the trial court's denial of a § 23–110 motion without a hearing only if the claims (1) are palpably incredible; (2) are vague and conclusory; or (3) even if true, do not entitle the movant to relief." *Id.* (internal quotation marks and citation omitted). In other words, absent a procedural bar (which has not been asserted in the present case), "we must be satisfied 'that under no circumstances could the petitioner establish facts warranting relief.'" *Joseph v. United States,* 878 A.2d 1204, 1209 (D.C.2005) (quoting *Ramsey v. United States,* 569 A.2d 142, 147 (D.C.1990)).

In exercising her discretion to deny Long's motion without a hearing, the motions judge was cognizant of these long-settled principles; her order quotes them. The judge did not decline to grant a hearing because Long's claims were "palpably incredible" or because they were "vague and conclusory." Taken in their entirety, his claims were neither.[10] Rather, the

10. Although Long's allegations were specific and detailed, which enhanced their credibility, some of them arguably could be faulted as lacking documentary substantiation. Under some circumstances, the absence of such substantiation may indicate that an allegation is incredible, vague or conclusory. Thus, where a defendant asserts that his counsel failed to call potential witnesses, for example, the trial court generally is entitled to require "an affidavit or other credible proffer as to the allegedly exculpatory nature" of the witnesses' testimony as a prerequisite to holding a hearing. *Lanton v. United States,* 779 A.2d 895, 902 (D.C.2001) (quoting *Ready v. United States,* 620 A.2d 233, 235 (D.C.1993)). However, in the present case, the government's position on appeal that Long's motion was not adequately supported by affidavits is not well taken. As the government acknowledges, Long actually did submit Padgett's affidavit, which of itself was sufficient to require a hearing without any of the corroborating affidavits the government now argues are necessary. Moreover, the government offered no opposition to Long's motion in the court below, nor was it asked by the motions judge to file one, and thus it did not raise any claim below of inadequacy of affidavits. The motions judge herself did not cite affidavit inadequacy as a basis for her ruling. Rather, in exercising her discretion to deny Long's motion without a hearing, the judge was ready to assume the truth of his allegations as to the testimony he could produce.

This court ordinarily will not sustain a discretionary ruling of the trial court on the basis of reasons that could have been but were not the actual basis for the ruling. *See Wright v. United States,* 508 A.2d 915, 920 & 920 n. 3 (D.C.1986). We have sound reason

judge ruled that "even if true," his allegations would not entitle him to relief. We cannot agree with the judge's analysis of that question.

In order to proceed with his Sixth Amendment claim of ineffective assistance of counsel, Long's burden was to plead with requisite particularity, in light of the full record before the court, that his trial counsel's performance was deficient under prevailing professional norms, and that the deficient performance prejudiced his defense. *Strickland v. Washington,* 466 U.S. 668, 687–88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "[W]e owe no deference" to the motions judge's legal conclusions that Long did not carry his burden in either respect. *United States v. Little,* 851 A.2d 1280, 1287 n. 10 (D.C.2004).

Long alleged, among other things, that his trial counsel knowingly failed to present an alibi witness (Rauch) and one or more other witnesses (Padgett and others named in Long's motion) who would have testified that Tilghman admitted shooting and killing Williamson himself. Such exculpatory and impeaching testimony would not have been merely cumulative, for there was no comparable testimony at Long's trial; nor would the proffered testimony have been inconsistent with the theory of Long's defense. Rather, the allegedly available testimony, if credible, would have been highly material and obviously would have undermined the prosecution's case and bolstered Long's actual defense at trial. It is well settled that counsel's unexplained failure to present such testimony constitutes deficient performance.[11] Perhaps there are good reasons why trial counsel did not call Long's proffered witnesses, but on the existing record, without holding a hearing, the motions judge was not in a position to make such a finding—nor did she profess to do so. *See Ginyard v. United States,* 816 A.2d 21, 37 (D.C. 2003) ("[W]here the defendant alleges that counsel failed to call a particular witness to testify on the defendant's behalf, counsel may have had valid reasons for not calling the witness, but because the reasons are usually not in the record, an evidentiary hearing is normally required.") (quoting *Reaves v. United States,* 694 A.2d 52, 58 (D.C.1997)).

In concluding that defense counsel's performance could not have been deficient because the proffered exculpatory testimony would not have overcome the government's case against Long, the motions judge erroneously conflated the performance and prejudice prongs of *Strickland.* The strength of the evidence against a defendant is no excuse for the defendant's counsel to lie down and play dead. If Long's attorney "was challenged to present a defense" for his client, as the judge stated, then under the professional norms that prevail in this jurisdiction and throughout the United States, that only meant the attorney had to work harder to do so.[12]

not to deviate from that general principle in this case, because before it rejects an otherwise sufficient § 23–110 motion for lack of supporting affidavits or other documentation, a trial court has the discretion and often may be well advised to grant the movant an opportunity to supplement his motion with such material. *See Metts,* 877 A.2d at 122; *Lanton,* 779 A.2d at 903–04 n. 10.

11. *See, e.g., Lopez v. United States,* 801 A.2d 39, 46 (D.C.2002); *Frederick v. United States,* 741 A.2d 427, 439 (D.C.1999); *Williams v. United States,* 725 A.2d 455, 460 (D.C.1999); *Matthews v. United States,* 629 A.2d 1185, 1194–96 (D.C.1993); *Bruce v. United States,* 617 A.2d 986, 997 (D.C.1992); *Gray v. United States,* 617 A.2d 521, 524–25 (D.C.1992); *Byrd v. United States,* 614 A.2d 25, 30 (D.C. 1992).

12. The other fact mentioned by the motions judge, that Long had "found fault" with every attorney who represented him, likewise has

To prove prejudice, Long was obligated to show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* The motions judge did not apply this test correctly, for she set the bar too high in ruling that Long's proffered evidence, while "relevant," was insufficient to "rebut" the prosecution evidence and "alter the case in its entirety." The Supreme Court explained in *Strickland* that "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case.... The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Id.,* 466 U.S. at 693–94, 104 S.Ct. 2052.

It cannot be said "at this point that, as a matter of law, the evidence of appellant's guilt was so strong that there can be no reasonable probability that the exculpatory evidence proffered in appellant's 23–110 motion, whatever its strength, could have raised a reasonable doubt in the minds of the jurors" at his trial. *Rice v. United States,* 580 A.2d 119, 123 (D.C.1990). The evidence of Long's guilt was substantial, but it was not without its weaknesses. As an admitted participant in the murder who was testifying against Long as part of a plea deal, Tilghman was of suspect credibility, and he was impeached with his statement to an FBI agent that he had fired the murder weapon and other prior inconsistent statements. Each of the other witnesses who identified Long was impeached as well—Wheeler admitted not knowing whether it was Long or Tilghman she saw, Thomas admitted having thought she was mistaken about Long, and Green told the police she could not make a positive identification. Thus, as in *Rice,* the government's case depended on witnesses "whose credibility a jury might have assessed differently" if it had heard the testimony proffered in the § 23–110 motion. *Id.* "Without a hearing to assess the credibility of the witness[es], however, we cannot tell what a jury might have done." *Newman,* 705 A.2d at 262. "[W]e have consistently held that credibility determinations cannot be based on affidavits or countered by conclusory statements but may be resolved only by recourse to a full evidentiary hearing." *Id.* at 261 (citations omitted).

In its present state, therefore, the record does not "conclusively show" that Long is "entitled to no relief" on his *Strickland* claims. D.C.Code § 23–110(c). Accordingly, it was an abuse of discretion to deny Long's motion without a hearing.[13]

## V.

For the foregoing reasons, we do not reverse Long's convictions outright, but we vacate the order denying his § 23–110 motion and remand the case to the Superior

no bearing on whether his trial counsel's performance was objectively unreasonable for the specific reasons Long cited.

13. We have mentioned that the motions judge did not call for or receive a response from the government to Long's motion. In some cases a government response may augment the record with specific, uncontroverted information that obviates the need for a hearing. *See Newman,* 705 A.2d at 262 n. 15. So far, at least, this does not appear to be such a case. Where the outcome turns on a credibility dispute, there is no substitute for an evidentiary hearing.

Court for further proceedings on the motion in accordance with our opinion.

*So ordered.*